UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

**LAUREN J. HELMBRECHT,**

**Plaintiff,**

     v.

**COMMISSIONER OF SOCIAL SECURITY,**

**Defendant**.

Case No. 1:19-cv-00027-TPK

OPINION AND ORDER

## OPINION AND ORDER

    Plaintiff Lauren J. Helmbrecht filed this action under 42 U.S.C. §405(g) asking this Court to review a final decision of the Commissioner of Social Security.  That final decision, issued by the Appeals Council on November 9, 2018, denied Ms. Helmbrecht's application for social security disability benefits.  Ms. Helmbrecht has now moved for judgment on the pleadings (Doc. 8) and the Commissioner has filed a similar motion (Doc. 11) .  For the following reasons, the Court will **DENY** Plaintiff's motion (Doc. 8), **GRANT** Defendant's motion (Doc. 11), and direct the Clerk to enter judgment in favor of the Defendant Commissioner.

### I.  BACKGROUND

    Plaintiff's application for disability insurance benefits was filed on September 20, 2015. She alleged that she became disabled on February 7, 2014, due to multiple psychological disorders.  She was 37 years old at the time her application was filed.

    After initial administrative denials of her claim, Plaintiff appeared and testified at an administrative hearing held on November 14, 2017.  A vocational expert, Jay Steinbrenner, also testified at the hearing.

    The Administrative Law Judge issued an unfavorable decision on February 23, 2018.  She first found that Plaintiff met the insured status requirements of the Social Security Act through June 30, 2019, and that she had not worked since her alleged onset date.  Next, the ALJ concluded that Plaintiff suffered from severe impairments including bipolar disorder, anxiety, borderline personality disorder, and post-traumatic stress disorder.  The ALJ found that none of these impairments met the criteria for disability under various sections of the Listing of Impairments.  Next, the ALJ determined that these impairments limited Plaintiff to the performance of a reduced range of medium work.  She could work only at low stress jobs, defined as involving the ability to understand, remember, and carry out simple, routine tasks and

make simple workplace decisions, to tolerate occasional interaction with coworkers, supervisors, and the public, and not involving tandem or team work. She could also tolerate occasional changes in work processes, settings, and schedules and could maintain attention and concentration for 2-3 hour blocks of time, but she could not perform work at production rate pace.

The ALJ determined that with these restrictions, Plaintiff could perform her past relevant work as a cleaner/housekeeper. Mr. Steinbrenner, the vocational expert, also identified other unskilled jobs which someone with the Plaintiff's residual functional capacity could do, including stock checker, warehouse worker, and packaging machine tender/operator. Based on this evidence, the ALJ found that Plaintiff was not disabled within the meaning of the Social Security Act.

Plaintiff, in her motion for judgment on the pleadings, asserts three claims of error. She argues: (1) that the ALJ improperly gave greater weight to the opinion of a non-examining source as opposed to the opinion of the consultative examiner; (2) the ALJ erred in disregarding one limitation imposed by Plaintiff's treating social worker; and (3) the ALJ did not properly account for Plaintiff's stress-related limitations.

## II.  THE KEY EVIDENCE

The Court begins its review of the evidence by summarizing the testimony given at the administrative hearing.

Plaintiff testified that she lived in a home with her husband and several children. She had difficulty being in crowds apart from family gatherings. Her husband usually accompanied her grocery shopping. She was able to drive herself to medical appointments. She had lost jobs in the past due to issues of attendance or theft and had been written up for causing trouble with others. She was fired from her last job as a certified nurse's aide based on allegations of patient abuse.

When asked why she could no longer work, Plaintiff said that her anxiety and her manic states prevented her from being employed. Her mental state varied from hour to hour. She was seeing a counselor once every month or two and also got medication from a nurse practitioner. She was taking medications for sleep and for mood stabilization, and they helped to some extent. Her dosage was still being adjusted. She reported having suicidal thoughts. Plaintiff was able to get her son out of bed, make his lunch, and get him to school. She said that several times per week she did not feel like getting out of bed. She also cared for the family pets (three dogs and four cats). Lastly, she said that her anxiety made her irritable.

The vocational expert identified Plaintiff's past work as cleaner/housekeeper, a light, unskilled job; certified nurse's aide, a medium, semi-skilled job; and residence supervisor, which was skilled and either light or sedentary. He was then asked if a person with the residual functional capacity to do medium work but with certain psychological limitations could do any of those jobs, and said that the cleaner job could be performed. So, too, could jobs like stock

checker, warehouse worker, and packaging machine tender. If that person also had to be isolated from other employees, he or she could still work as a housekeeper. Being off task more than 15% of the time would not be compatible with maintaining employment, however, nor would missing two or more days of work per month on a consistent basis.

The key medical records include treatment notes and opinions from various sources. These records are summarized in detail by both parties in their memoranda, and the Court will highlight only those portions which are most relevant to the decision here.

Plaintiff was seen at BryLin Behavioral Health Center beginning in March, 2015. The final treatment note, from November, 2015, shows that she was diagnosed with bipolar disorder and panic/anxiety disorder. She showed few symptoms at that time and her GAF was rated at 60. She was continued on medications which, she reported, helped her with mood stability. (Tr. 304-05). She was discharged from treatment in December, 2015, for non-compliance with program rules. (Tr. 342).

Plaintiff moved in 2016 and began treatment with Spectrum Human Services. A note from June, 2016, showed that she was still being treated with medication but was reporting mood instability, irritability, and agitation. Her mood was mildly dysphoric and her affect was full. The examination findings were mostly normal. At the conclusion of the examination, Plaintiff's medications were adjusted and she was advised to continue with monthly counseling. In late 2016, Plaintiff stated during an evaluation by a different provider that she had struggled with mood instability since she was a child and that her current home situation was stressful. She had done well on Lamictal and an increase in that medication was proposed. Progress notes from 2017 showed that her symptoms of mania were stabilizing but she frequently felt overwhelmed. Several of those notes are signed by Peter Leising, a licensed social worker. Some indicate that she was "doing ok."

Mr. Leising completed a questionnaire on September 7, 2016, indicating that Plaintiff's impairments were mild and that her GAF was 64. He identified moderate limitations in four functional areas and in seventeen separate mental abilities relating to work, and, most significantly, said that she would miss more than four days of work per month as a result of her mental impairments. (Tr. 444-48).

On January 7, 2016, Plaintiff saw Dr. Ippolito for a psychological evaluation. Plaintiff told Dr. Ippolito that she lived at home with her husband and two minor children. She said she could not work due to bipolar disorder and anxiety. Plaintiff reported difficulty sleeping, episodes of depression, excessive apprehension, flashbacks, nightmares, and manic episodes as well as difficulties with memory and concentration. Her affect was tense, anxious, and depressed, and her mood was dysthymic. On examination, her attention and concentration appeared to be impaired but her memory and cognitive functioning were normal. She reported being able to perform many household tasks and activities of daily living. In Dr. Ippolito's opinion, Plaintiff could follow and understand simple instructions, perform simple tasks, maintain attention, concentration, and a

regular schedule, learn new tasks, perform complex tasks independently, and make appropriate decisions. She could also relate adequately to others and appropriately deal with stress, although her limitations in these areas were described as "marked." Her prognosis was guarded. (Tr. 380-84).

Finally, there was an opinion expressed by a non-examining source. The state agency reviewer, Dr. Dipeolu, concluded that Plaintiff had severe mental impairments including an affective disorder, an anxiety disorder, and a personality disorder. In evaluating the Listing of Impairments, he stated that she had only mild limitations in the areas of activities of daily living and maintaining concentration, persistence, and pace, and a moderate limitation in maintaining social functioning. Citing to her ability to cook, clean, do laundry, shop for groceries, care for her children, and care for herself without assistance, he said that she was "capable of performing SGA [substantial gainful activity] in a low-contact low stress environment." (Tr. 85-86).

### III.  STANDARD OF REVIEW

The Court of Appeals for the Second Circuit has stated that, in reviewing a final decision of the Commissioner of Social Security on a disability issue,

> "[i]t is not our function to determine de novo whether [a plaintiff] is disabled." *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir.1996). Instead, "we conduct a plenary review of the administrative record to determine if there is substantial evidence, considering the record as a whole, to support the Commissioner's decision and if the correct legal standards have been applied." *Moran v. Astrue*, 569 F.3d 108, 112 (2d Cir.2009); *see also* 42 U.S.C. § 405(a) (on judicial review, "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive.").
>
> Substantial evidence is "more than a mere scintilla." *Moran*, 569 F.3d at 112 (quotation marks omitted). "It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted and emphasis added). But it is still a very deferential standard of review—even more so than the "clearly erroneous" standard. *See Dickinson v. Zurko*, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999). The substantial evidence standard means once an ALJ finds facts, we can reject those facts "only if a reasonable factfinder would have to conclude otherwise." *Warren v. Shalala*, 29 F.3d 1287, 1290 (8th Cir.1994) (emphasis added and quotation marks omitted); *see also Osorio v. INS*, 18 F.3d 1017, 1022 (2d Cir.1994) (using the same standard in the analogous immigration context).

*Brault v. Soc. Sec. Admin., Com'r*, 683 F.3d 443, 447–48 (2d Cir. 2012)

## IV.  DISCUSSION

### A.  The ALJ's decision

Because Plaintiff's claims of error mostly relate to how the ALJ dealt with the opinion evidence, the Court will first set forth in some detail the relevant portions of the ALJ's decision.

First, the ALJ accurately summarized the information from the treatment notes, reporting that Plaintiff's symptoms began to improve in 2015 once she had been taking a medication long enough to experience therapeutic effects and that her family and financial situations were causing her significant stress.  The ALJ also pointed out that Mr. Leising, Plaintiff's social worker, had endorsed only mild to moderate limitations in most basic work-related mental activities.  (Tr. 20).

The ALJ then reviewed the opinion evidence.  She gave great weight to the state agency reviewer's assessment as being based on a review of the medical evidence and consistent with the treatment history noting only moderate limitations in social interaction.  Next, she assigned some weight to Dr. Ippolito's opinion because it was consistent with Plaintiff's subjective reports but not entirely consistent "with the results of the examination or with the claimant's admitted activities, which support moderate limitations at most."  (Tr. 21).  Finally, turning to Mr. Leising's opinion, the ALJ also gave it some weight because the moderate limitations he identified were supported by the treatment records, but the conclusion that she would miss four days of work per month was not.  *Id.*

### B.  The Non-Examining and Consultative Opinions

Plaintiff's first argument is that the ALJ erred in giving greater weight to the opinion of the state agency reviewer, Dr. Dipeolu, than to the opinion of the consultative examiner, Dr. Ippolito.  Plaintiff appears to suggest that it is always error for an ALJ to prefer the views of a non-examining source to those of someone who has seen the claimant, even if that was only a one-time examination for evaluative purposes.  *See* Plaintiff's Memorandum, Doc. 8, at 10, *citing Velazquez v. Barnhart*, 418 F.Supp.2d 520 (W.D.N.Y. 2007).  However, that is not the law.

As this Court pointed out in *Gualtieri o/b/o M.J.G. v. Comm'r of Soc. Sec.*, 2019 WL 3497917, at *7 (W.D.N.Y. Aug. 1, 2019), the actual holding of *Velazquez* was that "the ALJ erred in discounting the opinions of three examining physicians who had an ongoing treatment relationship with the patient while favoring the opinion of a physician who had never examined the plaintiff."  That is not what occurred here.  Dr. Ippolito was a one-time examiner and had no treatment relationship with Plaintiff.  When deciding how much weight to give these types of opinions, the ALJ must simply determine the extent to which the record supports them.  Thus,

> an ALJ is entitled to rely on opinions from both examining and non-examining
> State agency medical consultants because these consultants are considered to be
> qualified experts in the field of social security disability. 20 C.F.R. § 416.927(e);

*see Frey ex rel. A.O. v. Astrue*, 485 F. App'x 484, 487 (2d Cir. 2012) (summary order) ("The report of a State agency medical consultant constitutes expert opinion evidence which can be given weight if supported by medical evidence in the record."); *Little v. Colvin*, 14-CV-0063 (MAD), 2015 WL 1399586, at *9 (N.D.N.Y. Mar. 26, 2015) ("State agency physicians are qualified as experts in the evaluation of medical issues in disability claims. As such, their opinions may constitute substantial evidence if they are consistent with the record as a whole.")

*James N. v. Comm'r of Soc. Sec.*, 2020 WL 1140498, at *6 (N.D.N.Y. Mar. 6, 2020).

Here, as the ALJ reasoned, the treatment notes and the opinion of Mr. Leising suggested that Plaintiff had no more than moderate limitations on her ability to deal with others and to cope with job stress. Even Dr. Ippolito, who rated the limitations in these areas as marked, said that Plaintiff had an "adequate" or "appropriate" ability to function in them. It was therefore reasonable for the ALJ to conclude, on this record, that Dr. Dipeolu accurately captured Plaintiff's ability to function in the work environment. The Court therefore rejects Plaintiff's contention that the ALJ erred in the way in which she weighed the respective opinions of Drs. Dipeolu and Ippolito.

### C. The Social Worker's Opinion

Plaintiff next argues that the ALJ erred by failing to accept Mr. Leising's statement that Plaintiff would miss four days of work per month. That is a work-preclusive limitation. As noted, the ALJ concluded that this statement was not supported by the record. The question presented by this claim is, as with many claims, whether the record actually supports the ALJ's conclusion.

It is true that an ALJ may not simply ignore a medical opinion concerning a claimant's ability to attend work on a sufficient number of days per month to maintain employment. *See, e.g., Merkel v. Commissioner of Social Security*, 350 F.Supp.3d 241 (W.D.N.Y. 2018). But that is not what occurred here. The opinion in question comes from a social worker, not a treating medical source, and it was not ignored but rather addressed by the ALJ. The Court finds this case to be similar to *Gannett v. Colvin*, 2014 WL 7345694 (N.D.N.Y. Dec. 23, 2014). There, as here, the claimant's social worker said on a questionnaire that the claimant would enough days of work per month to render the claimant (in the view of a vocational expert) unemployable. However, as here, the treatment notes showed that the claimant's symptoms improved over time and that she was demonstrating only moderate symptoms. Given that the ALJ was not required to afford controlling weight to the social worker's opinion, and that there are indications in the record that Plaintiff's symptoms are not so severe as to cause her to miss an excessive amount of work, this Court, like the *Gannett* court, finds no reversible error in the ALJ's determination.

### D. Stress-Related Limitations

Plaintiff's final argument is that the record supports the fact (and the ALJ also found) that she was experiencing stress-related limitations. She points out that when a claimant has difficulty dealing with stress, the ALJ must factor that difficulty into the residual functional capacity finding. Here, she asserts, the ALJ did not do so adequately, and did not make the kind of individualized determination that the case law requires.

Here, the ALJ, recognizing that all of the opinion evidence suggested stress-related limitations, concluded that Plaintiff was restricted to working in a low-stress environment, which the ALJ defined as involving the ability to understand, remember, and carry out only simple, routine tasks not involving tandem or team work or work at production rate pace, to make simple workplace decisions, to tolerate occasional interaction with coworkers, supervisors, and the public, to tolerate occasional changes in work processes, settings, and schedules, and to maintain attention and concentration for 2-3 hour blocks of time. Plaintiff has characterized the ALJ's finding as nothing more than limiting Plaintiff to the performance of simple tasks and making simple decisions. That is simply a misreading of the record. There are cases suggesting that even "an RFC limiting a plaintiff to occasional interaction with co-workers and the public, and to the performance of simple, routine tasks, may account for the plaintiff's stress-related limitations." *See Herb v. Comm'r of Social Security*, 366 F.Supp.3d 441, 447 (W.D.N.Y. 2019). The ALJ exceeded that standard here, and did not commit the claimed error in accommodating Plaintiff's stress-related limitations.

## V.  CONCLUSION AND ORDER

For the reasons stated above, the Court **DENIES** Plaintiff's motion (Doc. 8), **GRANTS** Defendant's motion (Doc. 11), and directs the Clerk to enter judgment in favor of the Defendant Commissioner.

/s/ Terence P. Kemp
**United States Magistrate Judge**